906 So.2d 1 (2004)
BARBER SEAFOOD, INC. d/b/a Uncle Chesters Fish House and Mississippi Restaurant Association Workmen's Compensation Trust, Appellants/Cross-Appellees
v.
Sandra Louise SMITH, Appellee/Cross-Appellant.
No. 2003-WC-01343-COA.
Court of Appeals of Mississippi.
August 3, 2004.
Rehearing Denied October 19, 2004.
Shane Curtis Whitfield, John S. Gonzalez, Gulfport, Robert Elliott Briggs, Biloxi, attorneys for appellants.
William H. Jones, Petal, attorney for appellee.
Before SOUTHWICK, P.J., MYERS and CHANDLER, JJ.
SOUTHWICK, P.J., for the Court.
¶ 1. Barber Seafood, Inc. and Mississippi Restaurant Association Workmen's Compensation Trust appeal the decision of the Circuit Court of Pearl River County affirming in part and reversing in part the ruling of the Mississippi Workers' Compensation Commission. Sandra Louise *2 Smith cross-appeals. Finding no error, we affirm.

FACTS
¶ 2. Sandra Louise Smith was employed as head cook at Uncle Chesters Fish House, which is the business name for Barber Seafood, Inc. Her job involved heavy manual labor. She worked fifty to eighty hours per week with an average salary of $300 per week.
¶ 3. On December 31, 1998, Smith slipped and fell because of water and grease on the kitchen floor of the restaurant. She attempted to break the fall by using her right arm to catch herself. The next day, she visited an emergency room where she was treated for pain in her back and right hand.
¶ 4. Smith visited Dr. McRaney, her family physician, approximately ten times after the injury. She was referred to other caregivers including an orthopedic surgeon, a neurological-orthopedic surgeon, a physician who specialized in pain management, a physical therapist, and a psychologist.
¶ 5. On February 23, 1999, diagnostic testing by CT examination revealed "loss of concavity of the intervertebral disc at the L4-5 level" with "no evidence of focal disc bulging or disc herniation at any level within the lower thoracic or lumbar spine regions." On May 13, 1999, MRI testing revealed "mild central disc protrusion at L5-S1 without marked spinal canal or neural foraminal stenosis. Otherwise, normal lumbosacral spine MRI."
¶ 6. Smith underwent carpal tunnel decompression surgery to the right wrist on June 15, 1999 by Dr. Charles Krieger, Jr. She reached maximum medical improvement (MMI) for this injury and was discharged by Dr. Krieger on September 17, 1999.
¶ 7. On June 10, 1999, Smith had an initial visit with Dr. Christopher Lew, a pain management specialist. Dr. Lew gave either myoneural lumbo-sacral or lumbar epidural injections from June through August 1999. There was a lapse of treatment from August 1999 to August 2001. In his progress notes of June 28, 2000, Dr. Lew states, "if she is not interested in further injections, then I have little else to offer her." The injections resumed on August 20, 2001.
¶ 8. On August 5, 1999, Smith started treatment by Dr. Louis Provenza, a neurological orthopedic surgeon. He noted that she suffered from "L5-S1 disk injury consistent with the history of suffering a fall." On September 17, 1999, Dr. Provenza recommended muscle strengthening and a functional capacity examination (FCE). The FCE was performed on November 11, 1999. The result was a recommendation that Smith be limited to sitting for ten minutes before she moved around, driving for one hour intermittently, walking five hundred feet during an eight hour day, lifting nothing over twenty-five pounds, and lifting up to ten pounds occasionally.
¶ 9. On November 12, 1999, Smith was transported by ambulance to the office of Dr. Provenza. She was admitted to the hospital where MRI testing revealed "multi-level stenosis most notable at L4-5 and slightly to a lesser extent at L5-S1, the stenosis present as a result of a large right posterior lateral disc herniation." This was said to be a deterioration of her condition. On December 23, 1999, Dr. Provenza recommended lumbar fusion at L5-S1 and L4-5 in order to treat two ruptured disks. He noted that the L4-5 was worse, and the L5-S1 was still there.
¶ 10. Smith was referred to Dr. Krieger for a second opinion. He found that she was a candidate for a diskectomy and fusion if she chose to accept the risk associated *3 with the procedure. Dr. Krieger was of the opinion that at this point, Smith was totally disabled and that surgery would not totally eliminate her pain.
¶ 11. A hearing was held before an administrative judge on September 5, 2001. The judge held that Smith failed to meet her burden of proof that there was a causal connection between the L4-5 condition and the accident at Uncle Chesters Fish House. The judge further held that Smith had suffered no loss of wage earning capacity and was not entitled to any permanent disability benefits.
¶ 12. Smith appealed to the Workers' Compensation Commission. By order of November 4, 2002, the Commission reversed as to permanent disability and permanent loss of wage earning capacity. The Commission found that Smith suffered a 25% loss of future wage earning capacity. In all other respects, the administrative judge's decision was affirmed.
¶ 13. From this ruling, Smith appealed to the Pearl River County Circuit Court and Barber Seafood cross-appealed. The circuit court affirmed the Commission's findings that the L4-5 injury was not work related; that the testimony and opinions of a Dr. Gutnisky were properly admitted; and that Smith suffered a 25% loss of wage earning capacity. The court reversed the finding that Smith reached MMI for the L5-S1 injury on June 28, 2000. The Commission was also found in error in concluding that surgery was not medically reasonable and necessary.
¶ 14. Barber Seafood has appealed the reversal of the Commission's decision that Smith reached MMI for her compensable back injury on June 28, 2000, and in awarding benefits for a loss of wage earning capacity. Smith has cross-appealed claiming that the L4-5 injury is work related and the testimony and opinions of Dr. Gutnisky should not have been admitted.

DISCUSSION

1. Date of Maximum Medical Improvement
¶ 15. Barber Seafood argues that the Circuit Court erred in reversing the Commission's finding that Smith reached maximum medical improvement on June 28, 2000. This date corresponds to the date on which Dr. Lew, a pain management specialist, disclosed in his office progress notes that "if she is not interested in further injections, then I have little else to offer her." The record reveals that Smith continued to receive injection therapy from Dr. Lew, although there was a lapse in treatment. Dr. Lew did not recommend surgery, though it should be noted that he was not a surgeon anyway.
¶ 16. The Commission stated "surgical intervention has not been shown to be medically reasonable and necessary." We give deference to the Commission's fact-findings. Still, the findings must be supported by substantial evidence. Marshall Durbin Companies v. Warren, 633 So.2d 1006, 1009-10 (Miss.1994). The circuit court found that the Commission had not properly characterized the medical testimony. We examine that testimony in some detail. Two of the three surgeons whose opinions are in the record, Dr. Provenza and Dr. Krieger, were sought out by Smith for treatment. Dr. Gutnisky examined Smith at the request of the Employer/Carrier.
¶ 17. Among the issues raised by Barber Seafood is that surgery at L5-S1 is not reasonable and necessary. However, all three surgeons testified that if surgery were performed, it would be necessary to correct the problem at both levels, L4-5 and L5-S1. While the Commission found *4 that there was no causal connection between the condition at L4-5 and the accident, neither of the three surgeons recommended an operation on one disc problem, leaving the other untouched. A single operation on both certainly is reasonable. Some allocation of costs might be appropriate, since part of the surgery would be on a problem that does not arise from a work-related injury. However, at this point no surgery is going to be performed for reasons that we address below. If the surgery ultimately is undertaken, a decision could be made then about whether Smith should be responsible for some of the costs attributable to surgery at the L4-5 level.
¶ 18. Dr. Provenza testified that he would offer surgical treatment in the form of a lumbar decompression and fusion at L4-5 and L5-S1. He based this opinion on the results of an MRI which confirmed two ruptured discs, with the rupture at L4-5 being worse than the one at L5-S1. Dr. Krieger testified that Smith was a candidate for diskectomy and fusion, if she chose to accept the risk and elected to undergo the surgical procedure. Dr. Gutnisky agreed that Smith was a candidate for spinal surgery. He said that the only reason to perform surgery would be to get rid of the pain, and that it was Smith's decision to have surgery based on what she desired to do regarding her degree of pain. None of the three surgeons stated that spinal surgery was unwarranted. To the contrary, all stated that it was an option for Smith to consider. None released Smith to return to work or stated a date of maximum medical improvement. The Commission's decision that none of the surgeons concluded that surgery was reasonable or necessary is not supported by substantial evidence.
¶ 19. Smith did not reach maximum medical improvement on June 28, 2000. The three surgeons who examined her all stated that surgery would benefit Smith, though there were some risks. Under binding Supreme Court precedents, we conclude that the refusal to undergo recommended surgery that would improve her condition prevents the claimant from being found to have reached maximum medical improvement. For now at least, Smith is entitled to be continued on temporary partial disability. Dorris v. Mississippi Reg. Hous. Auth., 695 So.2d 567 (Miss.1997).
Indeed, there is some evidence in the record in the case sub judice that disc surgery is not life-threatening and is much safer than it was years ago. However, the other evidence clearly indicated that Dorris' refusal to undergo surgery in this case was reasonable. Although all the doctors recommended surgery, the projected improvement in Dorris' condition after surgery was only about 10%. Furthermore, Dorris testified that he was afraid of the surgery: "[he's] 49 years old now and [he] don't heal as fast as he used to." Thus, given the facts in this case, Dorris' refusal to have the recommended back surgery was reasonable.
Therefore, under Triangle Distributors [v. Russell, 268 So.2d 911 (Miss. 1972)], Dorris is entitled to temporary benefits. This Court recognizes the dilemma in awarding a claimant temporary benefits on a seemingly "permanent" basis. However, this Court is also mindful of the difficult situation that could arise in the future, should Dorris choose to have the recommended surgery.
Dorris, 695 So.2d at 569. Three judges joined a dissent. Any reconsideration of the Dorris majority's position is for the Supreme Court to undertake.

*5 2. Loss of wage earning capacity

¶ 20. Barber Seafood next argues that the Commission erred in awarding disability benefits for a loss of wage earning capacity. The argument is that Smith did not demonstrate acceptable efforts to find other employment. The administrative judge and the Commission found that Smith's efforts were less than exemplary, but also concluded that Smith had not fallen so far short in her search as to deny herself all benefits.
¶ 21. Once Smith made a showing of a reasonable search for employment, the burden shifted to Barber Seafood to show otherwise. Pontotoc Wire Products Co. v. Ferguson, 384 So.2d 601, 603 (Miss.1980). It can be argued that the Commission found that Smith's efforts were not entirely reasonable. That may be true, but we find merit in the Commission's statement that Smith's search was not "so unreasonable as to preclude an award altogether." We leave the Commission's finding of a 25% loss of future earning capacity undisturbed.

3. Cross-appeal

¶ 22. Smith cross-appeals claiming that the injury at the L4-5 level was causally related to the work injury and that the introduction of the opinions of Dr. Gutnisky to the contrary were in error.
¶ 23. The argument against accepting Dr. Gutnisky's evidence focuses on whether Barber Seafood gave proper notice of the evidence. This doctor's deposition was taken after the hearing before the administrative judge. All parties were present for the deposition. The rules of the Commission specifically permit additional evidence to be taken after the initial hearing and for the Commission itself to take evidence. MISS. WORKERS' COMP. COMM'N PROC. RULE 8 & 9. The decision of the administrative judge was issued over eight months after the deposition was taken.
¶ 24. We find no error in the exercise of discretion by the administrative judge and the Commission to consider this deposition. We also find no error in the determination that one of the two claimed injuries was not work-related.
¶ 25. THE JUDGMENT OF THE PEARL RIVER COUNTY CIRCUIT COURT IS AFFIRMED BOTH ON DIRECT AND CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANTS AND ONE-HALF TO THE APPELLEE.
KING, C.J., BRIDGES, P.J., LEE, IRVING, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR.